No. 97,952

CITY OF WICHITA, KANSAS, a Municipal Corporation, *Appellee*, v.
KENNETH D. DENTON, d/b/a TILLIES FLOWER SHOP, *Appellee*,
and CLEAR CHANNEL OUTDOOR, INC., *Appellant*.

(294 P.3d 207)

Opinion filed January 4, 2013.

JoAnn T. Sandifer, of Husch & Eppenberger, LLC, of St. Louis, Missouri, argued the cause, and Caroline L. Hermeling, of the same firm, and Paul S.

*McCausland*, of Young, Bogle, McCausland, Wells & Blanchard, P.A., of Wichita, were with her on the briefs for appellant Clear Channel Outdoor, Inc.

*David M. Rapp*, of Hinkle Elkouri Law Firm L.L.C., of Wichita, argued the cause, and *Roger M. Theis*, of the same firm, was with him on the brief for appellee City of Wichita, Kansas.

*Stephen E. Robison*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, argued the cause, and *Lyndon W. Vix*, of the same firm, was with him on the brief for appellee Kenneth D. Denton, d/b/a Tillies Flower Shop.

The opinion of the court was delivered by

*Per Curiam*: This is an eminent domain proceeding involving the City of Wichita's condemnation for highway purposes of a tract of land owned by Kenneth Denton and located on the northwest corner of the intersection of Kellogg and Rock Roads. Clear Channel Outdoor, Inc., leased from Denton approximately 500 square feet of the property for operation of a double-sided, tri-vision billboard. The tract was valued at $1,075,600, with no compensation given for the billboard structure and with no consideration as to the advertising income produced by Clear Channel's leasehold. The City and Denton accepted the appraisers' award; Clear Channel appealed pursuant to K.S.A. 26-508. The district court granted summary judgment in favor of the City, affirming the appraisers' award. We have jurisdiction to review Clear Channel's appeal to this court pursuant to K.S.A. 2011 Supp. 26-504.

## FACTS

In 2002, the City filed a petition under the Kansas Eminent Domain Procedure Act (EDPA), K.S.A. 26-501 *et seq.*, wherein it sought to acquire fee simple title to property described as 7960 East Kellogg for highway purposes. This property is located on the northwest corner of the intersection of Kellogg and Rock Roads. The petition named Denton, the owner in fee title of the property and owner and operator of Tillies Flower Shop, and Clear Channel, a lessee on the property, among others, as defendants.

Clear Channel leased approximately 500 square feet of the 26,610-square-foot tract from Denton for the operation of a two-sided, tri-vision billboard. In November 2001, Clear Channel renewed its lease with Denton for an additional 20 years. The lease

provided that Clear Channel was authorized to erect and maintain outdoor advertising structures (billboards) on the property and stated that in the event the leased property was condemned, Clear Channel was entitled to "just compensation for the taking of the Structures and Tenant's leasehold interest in the Lease." In addition, the lease term automatically extended 30 years from the date of condemnation if the leased property was acquired by a government entity by way of eminent domain.

The billboard located on the property was originally constructed in 1985 by Clear Channel's predecessor in title and was in "nearly new" condition at the time of the taking. The structure consisted of a steel monopole that held two 14-by-48-foot, back-to-back billboard signs, each of which rotated three advertisements in 8-second intervals. The steel pole measured 3 feet in diameter and, including the billboard, extended 34 feet above the ground. The pole was set in a concrete foundation that extended approximately 12-feet square and 12-feet deep; the foundation itself was composed of roughly 96 tons of concrete. The entire structure weighed approximately 22,000 pounds and was designed to withstand gale-force winds.

Clear Channel considered its leasehold estate a premier location for outdoor advertising, asserting that it was "the most unique and valuable property interest" it owned in the Wichita area. The location provided access to the highest level of traffic circulation in the area and good visibility, and was part of a desirable socioeconomic area characterized by strong retail and commercial activity. The billboard space was steadily leased to advertisers, generating total revenue of $84,128 in 2003 alone. Clear Channel paid Denton $13,860 annually for its leasehold.

During the eminent domain proceedings, the district court appointed three appraisers to view the property and determine the appropriate compensation for the interests therein. The court instructed the appraisers that they were to value the tract as a whole. After the appraisers had inspected the property, the court held a hearing and entered an award of $1,075,600 as compensation for the taking.

Pursuant to K.S.A. 26-508, Clear Channel appealed the appraisers' award to the district court and requested a jury trial to determine the total damages for the condemned property. Denton did not appeal the appraisers' award and sided with the City on its arguments.

In August 2003, the City moved for partial summary judgment, seeking a legal determination of the property subject to valuation and, more specifically, arguing that the billboard and Clear Channel's permit, advertising contracts, and related assets were personal property not acquired by the City. In essence, the City argued that the EDPA required that the City compensate Clear Channel only for its interest in real property, as determined by the petition and appraisers' report, and that the City had taken only Clear Channel's leasehold estate and not the business assets used to conduct the advertising business there.

In its response, Clear Channel emphasized that the billboard was attached to the ground in concrete and thus constituted a fixture that was subject to valuation. In addition, Clear Channel argued that, although advertising income from the billboard was not itself real property, evidence of that income should be admitted to support its valuation theory, which was based on a capitalization of the yearly income generated by the sign.

After reviewing these arguments, the district court entered partial summary judgment in favor of the City on October 27, 2003. The court ruled that the billboard was personal property primarily because a buyer would not acquire the billboard as part of the purchase of the realty; the City was acquiring (and the appraisers valued) only Clear Channel's leasehold interest, not its personal property; Clear Channel paid personal property taxes on the billboard; and Clear Channel had the right to remove the billboard upon the expiration of the lease. The court also stated that Clear Channel could not present any evidence at trial that took into consideration the value of the billboard structure or the income produced thereby. The court deferred making a final ruling on the particular evidence that Clear Channel could present until it had reviewed the experts' reports and any potential motions in limine.

Discovery commenced. After taking depositions of Clear Channel's experts, the City filed a motion in limine seeking the exclusion of their testimony at trial. In its motion, the City contended that Clear Channel's experts based their property valuations on the billboard and corresponding income in violation of the court's earlier ruling. Clear Channel responded that the experts were testifying to valid valuations of property under Kansas law and filed a motion for reconsideration of the court's earlier grant of the City's motion for partial summary judgment.

The court held an evidentiary hearing on these motions in January 2005; at this hearing, the court heard testimony of each party's experts regarding their valuation opinions on the property.

Clear Channel presented testimony of its experts: Rodolfo Aguilar, Kurt Tingey, and David Mollhagan.

Aguilar, a professional engineer on the faculty of Louisiana State University who is certified to appraise real estate in several states, including Kansas, testified that the property value should be calculated based both on the land and on the income produced by the billboard. According to Aguilar, the revenues generated by a particular billboard are directly related to the success of a particular location, generally measured by a traffic count. He testified that he valued Clear Channel's leasehold interest in the same way he would a parking garage, office building, or hotel.

Aguilar presented testimony under three different methods of valuation—the income-capitalization approach, the market-comparison approach, and the cost-depreciation method. Aguilar first testified that, using an income-capitalization approach, Clear Channel's interest was worth $564,000. He arrived at this number by subtracting Clear Channel's operating expenses from the annual income the company derived from the Kellogg-Rock location—which resulted in a net annual income of $42,300—and capitalized that income by 7.5 percent.

For the market-comparison approach, Aguilar testified that the advertising industry relied on the gross-income multiplier method for selling advertising property. Applying this method, Aguilar used comparable sales of advertising property in the Midwest to calculate a gross-income multiplier—reached by dividing the purchase

price for the advertising property by the previous gross annual income. Under this approach, Clear Channel's interest was valued at $706,000.

Under the cost-depreciation approach, which is based solely on the cost of the billboard structure and its depreciation and not on any market indicators, Aguilar testified that the property was worth roughly $231,000. Aguilar characterized this number as a base value for Clear Channel's interest.

Reconciling these methods, Aguilar ultimately concluded that the fair market value of Clear Channel's interest in the condemned property was $611,000. He explained that this number was not included in the value of Denton's interest in the property. Thus, if Denton's interest was approximately $1,100,000, then the amount a willing buyer would pay on the open market for the entire property taken would be approximately $1,711,000.

Tingey, the executive vice president and chief financial officer of Clear Channel, testified that, when entering into leases for advertising purposes, he generally relied on an income-capitalization approach to set the price, based on the anticipated return of capital over a period of time. Tingey testified that he relied on this capitalization approach regardless of the size of the acquisition. Applying this approach to the Kellogg property, he multiplied the rate of return of 14 percent by the net after-tax revenue generated annually by the billboard, $51,000, taken over the life of the lease. He arrived at a value of $711,000.

Mollhagen, Clear Channel's real estate manager in Wichita, testified about restrictions on the erection of billboards in the City and the absence of a suitable replacement location for the condemned leasehold and sign structure. Mollhagen testified that most of the monopole and some structural components would be destroyed upon removal, but the billboard, in particular the tri-vision panels and other salvageable parts, would be stored for later reuse. Mollhagen also testified that Clear Channel paid personal property taxes on its billboard structures.

In addition to this testimony, Clear Channel provided an affidavit of Ron Blue, Clear Channel's general manager of operations in Wichita. The affidavit stated that, if Blue were permitted to

testify at trial, he would say that the Kellogg location was worth $700,000 to $750,000, based on comparable leasehold transactions in the area.

The City and Denton produced evidence from several other appraisers who concluded that the billboard and income therefrom should not be included in a valuation of the property.

In particular, Dwain Stoops, an appraiser retained by the City, testified that the billboard should not be included because it was a trade fixture and, therefore, personal property that did not contribute to the value of the land but instead contributed to the operation of Clear Channel's advertising business. Stoops testified that the most accurate appraisal of the property was based on a version of the income approach known as the bonus-value method, which measures the lessee's interest in a leasehold by comparing the contract and market rent. To the degree that the lessee pays less than market rent, the lessee enjoys a bonus value that is measured by the yearly savings on contract rent capitalized over the term of the lease. According to Stoops' calculations, consideration of the leasehold interest of Clear Channel would not necessitate an increase in the amount of the original appraisers' award.

After the court had heard the experts' testimony and the parties' corresponding arguments, it determined that the controlling issue in the case was the nature of the interests to be valued, and the judge confirmed the previous conclusion that the billboard was personal property for which no compensation was required. In the court's view, the billboard was a trade fixture removable by the lessee that would not transfer to a buyer of the fee. Because it found that Clear Channel's experts based their opinions on the value of the billboard and its income, which it had previously ruled to be noncompensable elements, the court granted the City's motion to exclude their testimony at trial. The court also denied Clear Channel's motion to reconsider.

Upon the conclusion of discovery, the City—joined by Denton—filed a motion for summary judgment, claiming that Clear Channel had failed to produce any admissible evidence regarding the value of the property as a whole. Clear Channel responded that it was

entitled to a jury trial in which it could present evidence of the value its leasehold contributed to the value of the entire tract.

The district court ruled in favor of the City and Denton and entered final judgment in favor of the City, holding that the original appraisers' award of $1,075,600 constituted just compensation for the taking of the entire tract. This appeal followed.

## DISCUSSION

In *State, ex rel., v. Urban Renewal Agency of Kansas City*, 179 Kan. 435, 438, 296 P.2d 656 (1956), this court explained that "the right to take private property for a public use is inherent in the state." Nevertheless, the State's power of eminent domain is limited by both federal and state law. In particular, the Fifth Amendment to the United States Constitution, made applicable to the states by way of the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation."

The procedures governing the exercise of eminent domain in Kansas are set forth in the EDPA, K.S.A. 26-501 *et seq.* K.S.A. 26-513 provides parameters for the property subject to condemnation and the methods for determining the compensation due. The statute commences with a codification of the Fifth Amendment, providing that "[p]rivate property shall not be taken or damaged for public use without just compensation." K.S.A. 26-513(a). Subsection (b) states that in cases where an entire tract of land or property interest is taken, as in the case before us, "the measure of compensation is the fair market value of the property or interest at the time of the taking." K.S.A. 26-513(b). "Fair market value" is defined in K.S.A. 26-513(e):

" 'Fair market value' means the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. The fair market value shall be determined by use of the comparable sales, cost or capitalization of income appraisal methods or any combination of such methods."

K.S.A. 26-513(d)(1) further states that an appraisal of a particular property's fair market value should take into consideration evi-

dence regarding "[t]he most advantageous use to which the property is reasonably adaptable." If a landowner "has adopted a peculiar mode of using the land, by which he derives profit, and he is to be deprived of that use, justice requires that he be compensated for the loss to himself." *Eisenring v. Kansas Turnpike Authority*, 183 Kan. 774, 779, 332 P.2d 539 (1958). Furthermore, "[i]t is the value which [the landowner] has, and of which he is deprived, which must be made good by compensation." 183 Kan. at 779 (citing 4 Nichols on Eminent Domain [3d ed.], § 12.32, p. 133).

Although the EDPA's language refers primarily to "owners" of condemned property, see, *e.g.*, K.S.A. 26-502(3)(a), this court has clarified that other real property interests, such as leaseholds, are also compensable in eminent domain actions. In *Eisenring*, the court explained that "in Kansas . . . a tenant under a lease is an 'owner' of property within the meaning of that term as used in our condemnation statutes, and is entitled to compensation if his leasehold estate is damaged by the exercise of eminent domain. [Citations omitted.]" 183 Kan. at 780. For this reason, we have explained that "where there has been a total taking of leased premises by eminent domain, the lessee's right to share in the award becomes vested at the time of the taking, absent an agreement in the lease to the contrary." *Urban Renewal Agency v. Naegele Outdoor Advertising Co.*, 208 Kan. 210, 215-16, 491 P.2d 886 (1971).

In cases where the property taken is owned by more than one entity—or where, as is the case here, that property consists of both a fee ownership and a leasehold—the EDPA establishes a two-stage approach to compensating for the taking. This court explained in *Phillips Petroleum Co. v. Bradley*, 205 Kan. 242, 247, 468 P.2d 95 (1970):

"It has long been the rule that where leased property is taken by eminent domain, it is ordinarily *valued* as though held in a single ownership rather than by separately valuing the interests of the lessor and lessee, and the compensation for the property taken or damaged is *apportioned* by the district court between the lessor and lessee according to their respective interests." (Emphasis added.)

As this court indicated in *Phillips Petroleum Co.*, these two phases of the condemnation process are often referred to as the valuation and apportionment stages. During the first phase of the

proceedings—the valuation stage—disinterested appraisers are appointed by the court to determine the value of the whole interest taken without regard to the amount due to individual property owners. See K.S.A. 2011 Supp. 26-504; *Phillips Petroleum Co.*, 205 Kan. at 247. After the value of the entire interest taken has been finally determined, either by the court-appointed appraisers or by way of an appeal from the appraisers' award, the second phase of the eminent domain proceedings—the apportionment stage—commences. During this stage, the court determines the value of the individual interests taken and apportions the award accordingly. See K.S.A. 26-517. "The condemner has no interest in the apportionment proceedings. It has met its obligation when it has paid into court the total amount of the award. (29A C.J.S., Eminent Domain § 198, p. 873.)" 205 Kan. at 247.

Because the current case is an appeal from the valuation stage of the eminent domain proceedings, we are not concerned with the compensation that is specifically due Denton or Clear Channel, but rather with the *value of the entire tract taken*. For this reason, we treat the land as if it were held in a single ownership and do not differentiate between Denton's or Clear Channel's interests for valuation purposes. See *Phillips Petroleum Co.*, 205 Kan. at 247. Our sole concern is whether the district court was correct in ruling as a matter of law that the appraisers' award provided just compensation for the tract of land taken in this condemnation action. See K.S.A. 2011 Supp. 26-508(a); K.S.A. 26-513(a), (b). We conclude that the district court was correct in concluding that the billboard structure was a noncompensable item and that evidence of the billboard and its advertising income must be excluded. We therefore affirm the district court.

*Standards of Review*

On appeal, Clear Channel claims that the sign structure was a leasehold improvement destroyed by the taking rather than merely noncompensable personal property. In the alternative, even if the sign structure was only personal property, Clear Channel argues that the sign structure's value was relevant to overall value of the tract because lost rental income from it was the direct result of the

leasehold location. It also argues that the value of the leasehold for advertising purposes was relevant because it enhanced the value of the property as a whole.

The general function of an appellate court is to determine whether the trial court's findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. 313, 318, 64 P.3d 372 (2003). An appellate court's review of conclusions of law is unlimited. *Nicholas v. Nicholas*, 277 Kan. 171, 177, 83 P.3d 214 (2004). This standard is not altered in the context of an appeal from an eminent domain proceeding. See K.S.A. 2011 Supp. 26-508(a) (stating that an eminent domain "appeal shall be docketed as a new civil action, the docket fee of a new court action shall be collected and the appeal shall be tried as any other civil action"). We therefore apply the usual test for reviewing the district court's grant of summary judgment:

" ' "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences [that] may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." ' [Citations omitted.]" *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 788, 107 P.3d 1219 (2005).

In this case, the district court's grant of partial summary judgment led directly to its grant of the City's subsequent motion in limine, which excluded the testimony of Clear Channel's appraisal experts due to the court's conclusion that the factors on which the experts based their testimony—namely, the billboard structure and the advertising income—were not compensable in the eminent domain action. The purpose of an order in limine is to assure a fair and impartial trial to all parties by excluding from trial inadmissible

evidence, prejudicial statements, and improper questions. *State v. Abu-Fakher*, 274 Kan. 584, 594, 56 P.3d 166 (2002). An order in limine should be granted if the trial court finds that two factors are present: (1) The questioned material or evidence would be inadmissible at a trial under the rules of evidence; and (2) the mere offer during trial concerning the material will likely prejudice the jury. *State v. Horn*, 278 Kan. 24, 37, 91 P.3d 517 (2004).

Because a motion in limine is an evidentiary motion, this court must also consider the appropriate standard for reviewing the admission or exclusion of evidence in an appeal from an eminent domain proceeding. This court has explained that

"any competent evidence bearing upon market value generally is admissible including those factors that a hypothetical buyer and seller would consider in setting a purchase price for the property. 5 Nichols [on Eminent Domain], § 18.05[1] [(3d ed. 1997)]. Considerable discretion is vested in the trial court in admitting or rejecting evidence of value, and the latitude accorded to the parties in bringing out collateral and cumulative facts to support value estimates is left largely to the discretion of the trial court. 5 Nichols, § 18.05[1]. See *City of Shawnee v. Webb*, 236 Kan. 504, 511, 694 P.2d 896 (1985)." *City of Wichita v. Eisenring*, 269 Kan. 767, 773-74, 7 P.3d 1248 (2000).

This rule regarding the district court's discretion in admitting or excluding evidence in an eminent domain proceeding is not articulated in the EDPA but rather is a result of judicial construction. Thus, although the procedures governing eminent domain actions are statutory in nature, appellate courts review a district court's evidentiary rulings in an eminent domain proceeding in much the same way as they would any other appeal. See K.S.A. 60-402 (stating that "the rules set forth in this article shall apply in every proceeding, both criminal and civil, conducted by or under the supervision of a court, in which evidence is produced"); *Garrett v. Read*, 278 Kan. 662, 667, 102 P.3d 436 (2004) (stating that "the admission of evidence lies within the sound discretion of the trial court").

The threshold determination for the admission of evidence in any proceeding is relevance. See *Mooney v. City of Overland Park*, 283 Kan. 617, 620, 153 P.3d 1252 (2007). Relevant evidence is "evidence having any tendency in reason to prove any material

fact." K.S.A. 60-401(b). The general rule is that "all relevant evidence is admissible." K.S.A. 60-407(f); see *Eisenring*, 269 Kan. at 773 (stating that "any competent evidence bearing upon market value generally is admissible" in an eminent domain proceeding).

Although this court has traditionally stated that a district court's evidentiary rulings will be overturned only when the district court abused its discretion, we have clarified that an appellate court's review of a district court's admission or exclusion of evidence—including the court's determination of whether the evidence was relevant—is actually guided by the character of the question considered. Thus, an appellate court may review a district court's evidentiary determination under an abuse of discretion or as a matter of law. When the issue involves the adequacy of the legal basis for the district court's decision, the issue is reviewed using a de novo standard. See *Mooney*, 283 Kan. at 620.

This court has recognized that, although the law favors the admission of evidence, "the responsibility of defining the extent of compensable rights [in eminent domain proceedings] is in the courts[;] and if it is established that value testimony was based on noncompensable items or the credibility of the testimony is otherwise destroyed[,] the testimony should be stricken in response to a proper motion." *Morgan v. City of Overland Park*, 207 Kan. 188, 190, 483 P.2d 1079 (1971).

### The Character of the Billboard Structure

The district court ruled in its grant of the City's motion for partial summary judgment that the billboard structure was mere personal property classified as a trade fixture and thus not compensable for purposes of eminent domain. Clear Channel challenges this ruling on appeal, arguing that the majority of states have found that billboards are fixtures that enhance the value of particular real property and thus should be included in the calculation of that property's appraised value.

Personal property is not compensable in condemnation actions unless that property is affixed to the real estate—that is, unless the alleged personal property is so permanent in character that it can be classified as an improvement to the real estate. See *Eisenring*,

269 Kan. at 783. This court explained in *Rostine v. City of Hutchinson*, 219 Kan. 320, 323-24, 548 P.2d 756 (1976) (quoting *Hoy v. Kansas Turnpike Authority*, 184 Kan. 70, 74, 334 P.2d 315 (1959), that "articles of personal property which have become affixed to the real estate . . . 'are a part of the real estate and must be considered in determining the value of the land taken.' " See *Hoy*, 184 Kan. at 78-79 (personal property that becomes improvement adds value). We have referred to such improvements as "fixtures," but we avoid that term in this particular discussion to eliminate any confusion with the phrase "trade fixture."

To determine whether personal property has become so permanent in character that it must be classified as an improvement to real estate, Kansas courts consider (1) the degree of permanency with which the property is attached to the realty; (2) the adaptation of that property to the use or purpose to which the realty is devoted; and (3) the intention of the property's owner to make the property a permanent accession to the freehold. *Water Co. v. Irrigation Co.*, 64 Kan. 247, 252-53, 67 Pac. 462 (1902). Although the question whether a feature of real property is an improvement is generally a question to be resolved by the trier of fact, this is not true if the evidence is "susceptible to only one inference." See *Eisenring*, 269 Kan. at 783 (citing 35 Am. Jur. 2d, Fixtures § 75).

The general rule is that chattels affixed to real property become part of the realty. See *Railroad Co. v. Nyce*, 61 Kan. 394, 400-01, 59 Pac. 1040 (1900); 35A Am. Jur. 2d, Fixtures §§ 1, 5, 74, 98-104. Trade fixtures represent an equitable exception. *Railroad Co. v. Jefferson County*, 114 Kan. 156, 161, 217 Pac. 315 (1923) (*Union Pacific*). This court explained in *Union Pacific* that the " 'trade fixtures' rule frequently [arose] over clashing interests of landlord and tenant and situations analogous thereto . . . where the title to the realty of the right of way was in one owner and the railway improvements or fixtures belonged to another owner who had no valid claim to the realty." 114 Kan. at 161. In such cases, the classification of an item as a trade fixture allowed the lessee to retain ownership of that item—and the right to remove it from the realty—on termination of the lease. See 114 Kan. at 161.

Clear Channel argues that, because the interests taken in a condemnation action are appraised as if held in one ownership during the valuation stage of the proceedings, the distinction as to whether the lessor or lessee would retain ownership of the affixed property is irrelevant to the value of the property taken. Indeed, the distinction is particularly important during the second phase of the proceedings—the apportionment stage—when the appraisers' award is divided among the parties according to their interests. But it is not irrelevant during the valuation stage. One cannot calculate the value of the property to be taken without knowing what property is to be taken. Before the factfinder in this case could arrive at a value of the real estate, it would need to know whether to include the value of the billboard, *i.e.*, whether it was part of the land or noncompensable, removable personalty.

Turning back to the relevant factors, the sign structure located on the property in this case was attached to the land by way of a concrete foundation and had been in place for 20 years. The parties contemplated a long-term lease, and all experts in this case agreed that the best use of the particular tract of land being taken was commercial, including such a billboard structure. However, the property owner's intent and Clear Channel's understanding and acceptance of it are undisputed and overwhelming. The billboard clearly was meant to remain the personal property of Clear Channel, including the right to remove it upon termination of the land lease. See *Water Co.*, 64 Kan. at 252-53; see also *Urban Renewal Agency v. Naegele Outdoor Advertising Co.*, 208 Kan. 210, 215, 491 P.2d 886 (1971) (noting "[p]ersonal property, in and of itself, of course, is not subject to condemnation," where billboard owner had removed the physical property composing the sign). Although some structural components were or would be destroyed upon removal, Clear Channel's real estate manager testified that Clear Channel intended to reuse the billboard, in particular the tri-vision panels, which were designed to be removable.

Accepting the opposite conclusion for which Clear Channel advocates would effectively force the City to condemn any and all ownership rights Clear Channel may have had in the billboard, even if the City had no intention of exercising its eminent domain

power to take such a trade fixture. *Cf.* K.S.A. 26-502 (condemnation petition to describe the nature of the interests to be taken). This would run afoul of the notion that the condemning authority may take only what is necessary to accomplish its public purpose, see K.S.A. 2011 Supp. 26-504 (requiring judicial finding that taking necessary to lawful corporate purposes of condemning party), because the City did not need the billboard in order to improve the streets. If the City had needed the billboard, and it had condemned it, Clear Channel could not lawfully have taken the sign structure off of the land.

Ultimately, we are persuaded that the district court was correct in concluding that the sign structure retained its character as mere personalty or a trade fixture. Accord *Rite Media, Inc. v. Secretary of Massachusetts Highway Department*, 429 Mass. 814, 816-17, 712 N.E.2d 60 (1999) (structures subject to removal by lessee not interests in real estate, billboard personal property not taken); *State, ex rel. Com'r v. Teasley*, 913 S.W.2d 175, 178 (Tenn. App. 1995) (billboard owned by and subject to removal by lessee, noncompensable personal property). The property owner intended this. Clear Channel understood it, and it paid personal property taxes on the billboard. It had the right to remove the billboard upon the expiration of the lease. And it would have retained ownership if Denton sold his fee interest in the tract to another party.

*Evidence of Advertising Income*

Clear Channel also argues that the district court erred when it granted the City's motion for partial summary judgment and motion in limine excluding evidence relating to the advertising income generated by the billboard.

As an extension of its ruling that the billboard was noncompensable personal property, the district court concluded that the advertising income from it was irrelevant to the determination of just compensation in the eminent domain action. It therefore excluded evidence relating to the income from the billboard. This ruling is consistent with our decision above that the billboard structure is not a compensable improvement to the land under Kansas law.

Clear Channel nevertheless claims on appeal that *regardless* of the district court's classification of the billboard as noncompensable personal property, evidence of the advertising income produced by the billboard was relevant to an accurate computation of the value of Clear Channel's interest. It argues that the advertising income was generated primarily by the *location* of the billboard, not by the billboard itself. The City disagrees, stating that no matter whether the billboard is characterized as real or personal property, the income produced by it was business profit that may not be considered in eminent domain actions.

Kansas defines just compensation in terms of the fair market value of condemned property interests. See K.S.A. 26-513(a), (b). Fair market value is the monetary amount "that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion." K.S.A. 26-513(e). This definition necessarily takes into account the industry standards that govern the valuation of different types of property on the open market. See *City of Mission Hills v. Sexton*, 284 Kan. 414, 422-23, 160 P.3d 812 (2007).

In order to better accommodate the different types of property that are bought and sold in today's marketplace, the EDPA was modified in 1999 to place the three principal methods of valuing modern real estate "on equal footing." *Eisenring*, 269 Kan. at 774-75. These include the "(1) cost approach—the reproduction cost of the property at the time of taking less depreciation; (2) market data approach—the value of the property based upon the recent sales of comparable properties; and (3) income approach—the capitalization of net income from the property. [Citation omitted.]" 269 Kan. at 774; see K.S.A. 26-513(e). This court has previously explained that the income approach, also known as the income-capitalization approach, is particularly suitable when property is producing or is capable of producing income. See *In re Application of City of Great Bend for Appointment of Appraisers*, 254 Kan. 699, Syl. ¶ 6, 869 P.2d 587 (1994).

In *Eisenring*, we recognized that although our previous decisions favored the market data approach over the two other valuation

methods, the Kansas Legislature amended the EDPA in 1999 to conform to the "modern approach in condemnation actions." 269 Kan. at 775. This "modern approach . . . recognizes all three methods and allows the income approach to be used even where comparable sales exist." 269 Kan. at 775.

It has long been the rule in this state that the profits from a business conducted on a particular piece of property are not compensable losses in a condemnation action. This is based on the recognition that

" '[i]f the owner of property uses it himself for commercial purposes, the amount of his profits from the business conducted upon the property depends so much upon the capital employed and the fortune, skill and good management with which the business is conducted, that it furnishes no test of the value of the property. It is, accordingly, well settled that evidence of the profits of a business conducted upon land taken for the public use is not admissible in proceedings for the determination of the compensation which the owner of the land shall receive.' " *City of Bonner Springs v. Coleman*, 206 Kan. 689, 694, 481 P.2d 950 (1971) (quoting 5 Nichols on Eminent Domain, § 19.3(1), p. 19-48).

Despite this general rule, the *City of Bonner Springs* court recognized that a well-settled exception exists for rents or other income *generated by the land itself*, which are not treated as business profits but rather as income that may be considered as a factor in valuation during eminent domain proceedings. As we explained in that case:

" '[I]t is important to bear in mind that the courts distinguish between the income from a business conducted on real estate and the income from rents that the real estate produces. The former income is generally excluded . . . . But the income from rents is admissible. To be sure, rental income from real estate is to some degree income from a business, and the net income from it is actually the profit. Nevertheless, this income is more likely to continue when the property is sold in the market; whereas a business conducted on the property by the owner is generally excluded from the sale. The business there does not go with the sale of the property.' " 206 Kan. at 694 (quoting Jahr on Eminent Domain, § 147, p. 226).

The court further recognized that the distillation of rental income from the business profits will almost always require expert testimony, where the expert will "take the gross profit from a business and reduce it to rent and then capitalize the rent for the purpose of arriving at the value of the property on which the busi-

ness is located." 206 Kan. at 695. Such experts must "be well enough informed [so as to] recognize the uncertainties and contingencies and eliminate them or make proper allowances." 206 Kan. at 695.

The Michigan Court of Appeals noted the basis for admitting evidence of rental income in such cases in *In re Acquisition of Leases*, 205 Mich. App. 659, 662 n.2, 517 N.W.2d 872 (1994):

"In the real world beyond the courthouse walls, reasonable buyers deciding how much to pay for income-producing real property, and reasonable sellers deciding how much to sell income-producing real property for, necessarily must consider the property's ability to produce income."

The distinction between business profits and rental income is drawn into sharp focus by the bonus-value method advocated by the City in this case, which requires the court to consider the value of rents paid by Clear Channel to Denton for its lease. Such rents are not part of the realty itself or affixed thereto, but courts allow such evidence to be considered because the rent is deemed to be *generated by the property* or "intrinsically related to the land." *City of Roeland Park v. Jasan Trust*, 281 Kan. 668, 673-74, 132 P.3d 943 (2006).

Rental income derived from the leasing of office space or residential apartments is admissible as evidence of the value of income produced by the property itself. See *City of Overland Park v. Dale F. Jenkins Revocable Trust*, 263 Kan. 470, 478-80, 949 P.2d 1115 (1997) (dividing compensation between the lessor of commercial real estate and the lessee based on the bonus value of the lease). Income produced by a retail business, such as a shoe store or a floral shop, is treated as business profits, and evidence of such profits is therefore excluded in eminent domain proceedings. See *City of Roeland Park*, 281 Kan. at 676 (stating that profits from a shoe store would not be admissible under "general condemnation law"). Aside from these categorical distinctions, we have not developed criteria to determine whether certain evidence is inadmissible profits or admissible rents.

The main question as to how the rental income versus business profits distinction applies to this case is not whether rental income

in and of itself may be considered when appraising land in an eminent domain action, but rather whether the income generated by the billboard in this case is rental income *derived from the land* or profits from a business *conducted on the land.*

Implicit in our previous decisions is the recognition that the income introduced as evidence must be produced exclusively or primarily by the location—the realty itself that is taken in the eminent domain action. See *City of Roeland Park,* 281 Kan. at 674; *Eisenring v. Kansas Turnpike Authority,* 183 Kan. 774, 782-84, 332 P.2d 539 (1958); see also *Bales v. Railroad Co.,* 92 Kan. 771, 777, 141 Pac. 1009 (1914) (in determining the market value of a furniture dealer's lease, it was appropriate to consider "the nature and prosperity of the business carried on there, *if it affects the value of the lease*" [emphasis added]). For example, in cases involving the condemnation of commercial office buildings, courts have recognized that it is the property—the location of the office space rented— that generates the income rather than the business acumen of the property owners. See generally *City of Overland Park,* 263 Kan. 470. Thus courts should consider whether the source of the income is the rental of *space*—that is, location—or the provision of some product or service that is not directly related to the realty.

Furthermore, in the limited circumstances where income is admissible in eminent domain actions, that income must not be speculative; it must be based on known figures. "A naked statement of gross income is too uncertain and depends upon too many speculations and contingencies to safely be accepted as evidence of the usable value of property upon which a business is carried on." *City of Bonner Springs,* 206 Kan. at 694. See also *McCall Service Stations, Inc. v. City of Overland Park,* 215 Kan. 390, 398, 524 P.2d 1165 (1974) (the income approach is the "best method for determining value" when the income from the property is "known" and "there are no other comparable sales available").

Under these rules, the revenue generated by the leasehold, *i.e.,* the $13,860 paid in rent to Denton annually, is a necessary part of the valuation. However, we are not persuaded that the advertising income generated by Clear Channel's billboard is derived from the land or that it is relevant to the valuation for condemnation pur-

poses. Clear Channel is in the business of selling advertising. While one can appreciate that a desirable location would help Clear Channel market its services, there are other factors at play, such as the pricing and terms of payment it offers to its customers, whether the billboard height and angle facilitate easy viewing by passers-by, whether the sign is regularly maintained, whether billing errors are routinely not remedied or are handled by unpleasant employees, whether the business offers advice and consultation on advertising content, or any number of things that can affect the acquisition and retention of a client base. On the flip side, Clear Channel may be well-capitalized and uniquely adept at holding down its expenses. It may have superior bargaining power with its vendors and have the economy of scale to spread its costs over several billboards, as opposed to another business that may own only one billboard.

In short, Clear Channel's profit, like that of any other business, is dependent on " 'the capital employed and the fortune, skill and good management with which the business is conducted.' " See *City of Bonner Springs*, 206 Kan. at 694 (quoting 5 Nichols on Eminent Domain, § 19.3[1], p. 19-48). To be sure, the location may play a role in the success of the business, but this is equally true for a convenience store or any number of other businesses. But location alone, no matter how unique, does not create revenue. One can imagine an undercapitalized billboard owner, who is unskilled in marketing and incompetent at managing a business, failing to generate a profit on even the most desirable of locations. Obviously, in that case, it would be wrong to employ Clear Channel's version of the income method of appraisal to determine that the City owed nothing for the land. That is precisely why we have opined that evidence of profits " 'furnishes no test of the value of the property.' " *Coleman*, 206 Kan. at 694 (quoting 5 Nichols on Eminent Domain, § 19.3[1], p. 19-48).

We recognize, as Clear Channel has pointed out, that there are authorities to the contrary in other jurisdictions. See *State v. Weber-Connelly, Naegele, Inc.*, 448 N.W.2d 380, 384 (Minn. App. 1989) (location factor, where property itself generates income, billboard cannot be relocated); *Nat'l Adv. Co. v. State, Dept. of*

*Transp.*, 116 Nev. 107, 113-14, 993 P.2d 62 (2000) (advertising income appropriately considered in valuing condemned leasehold interests, noting "importance of location," "difficulty in relocating"); *Lamar Corp. v. Commonwealth Transp. Comm'r*, 262 Va. 375, 386, 552 S.E.2d 61 (2001) (evidence of income admissible because intrinsic to land, not business profit); see also *National Advertising v. State, DOT*, 611 So. 2d 566, 568-70 (Fla. Dist. App. 1992) (error in excluding evidence of rental income, relevant to value of leasehold interest); *State v. Obie Outdoor Advertising*, 9 Wash. App. 943, 948-49, 516 P.2d 233 (1973) (rental income appropriate consideration in valuing property admissible where sign could not be relocated).

Some of these cases have stressed the uniqueness of specific billboard locations. See *City of Scottsdale v. Eller Outdoor Advertising*, 119 Ariz. 86, 94, 579 P.2d 590 (Ariz. App. 1978) (valuation of "unique" billboard location based on rental income appropriate); *Lamar Advantage Holding Co., Inc. v. Arkansas State Highway Comm'n*, 369 Ark. 295, 298-300, 253 S.W.3d 914 (2007) (same, concluding income primarily function of unique location); *DURA v. Berglund-Cherne*, 193 Colo. 562, 567, 568 P.2d 478 (1977) (same, concluding rental income generated by uniqueness of land).

But we are unwilling to grant billboard businesses a preferential right to be compensated for lost business profits in a condemnation action, when such compensation is barred for all other businesses. We also believe that appellant's position distorts the income method of real estate appraisal by converting it from a capitalization of rents generated by the land itself into a capitalization of profits generated by the business acumen of the billboard business owner. Accord *City of Newport Mun. H. Com'n v. Turner Advertising*, 334 S.W.2d 767, 770 (Ky. 1960) (injury to billboard business not compensable property taken); *State, Mo. Hwy. & Transp. Com'n v. Quiko*, 923 S.W.2d 489, 496 (Mo. App. 1996) (same, billboard not "inextricably connected with" land; taking did not constitute appropriation of business); see also *State v. Bishop*, 800 N.E.2d 918, 926 (Ind. 2003) (evidence of rental income not appropriate factor in valuation where billboard could be relocated).

The district court did not err when it ruled that evidence of Clear Channel's advertising income from the sign structure was irrelevant to the issue of just compensation in this case.

## The Unit Rule

Finally, we address the role of the unit rule in this action. Under the unit rule, evidence could only be introduced relating to the value of the property as a whole, not to the value of individual elements on that property. The basis for this rule, as the court explained in *Ellis v. City of Kansas City*, 225 Kan. 168, 174-75, 589 P.2d 552 (1979), was that it defeated the purpose of the market-comparison approach—the favored approach under the pre-1999 EDPA—to consider separate parts of the land individually, as the question to be resolved was the price an informed purchaser would pay for that entire tract of land, not a part of it.

In its ultimate grant of summary judgment, the district court held that Clear Channel had failed to demonstrate that any issues of material fact on the correctness of the appraisers' award because it had produced no evidence relevant to the value of the entire tract in question. Clear Channel argues that it should have been permitted to introduce evidence limited to whether the value of its leasehold estate enhanced the value of the entire tract. In practical terms, it asserts, it could show that its leasehold was worth more than 500 square feet of unimproved property, and its ability to do so should have precluded summary judgment.

We do not quarrel with Clear Channel's assertion that, despite the unit rule, when a party is introducing evidence relating to the value of the condemned property under an income-capitalization approach, the evidence may include expert testimony relating only to the income-generating potential of a particular part of the land. *Creason v. Unified Gov't of Wyandotte County*, 272 Kan. 482, 486-90, 33 P.3d 850 (2001) (regarding income question, party may present testimony of specialized experts who may not be qualified to give an opinion as to the fair market value of the entire tract); *Ellis*, 225 Kan. at 175 (rule "does not apply when either the depreciated replacement cost or the capitalization of income method of valuation is employed"). The unit rule is not violated as long as the

ultimate award from the valuation proceedings is not itemized and assigns only one value to the property as a whole.

However, we have held that the district court correctly excluded evidence of the value of the sign structure as personalty, *i.e.*, a noncompensable trade fixture rather than a compensable improvement to the land. We have also held that the district court correctly excluded evidence of the advertising income produced by the billboard because this income represented business profits rather than rental income generated by the property itself. Clear Channel presented no other, admissible evidence regarding the value of its leasehold or the tract as a whole. Therefore, summary judgment was properly granted.

## CONCLUSIONS

In conclusion, our review of the record on appeal and the law governing this case leads us to the following conclusions:

The district court correctly granted the City's motion for partial summary judgment and motion in limine excluding evidence of the value of the sign structure, because the undisputed facts in this case demonstrate that the billboard was personal property for which compensation is not allowable in an eminent domain proceeding.

The district court did not err in granting the City's motion for partial summary judgment and motion in limine excluding evidence of the advertising income generated by the billboard, because this evidence—representing business profits rather than rental income—was irrelevant to the value of the property under any authorized valuation approach.

The district court did not err in granting the City's motion for summary judgment, because Clear Channel did not come forward with relevant and admissible evidence that could alter the appraisers' valuation of the land at issue.

The district court's rulings granting the City's motion for partial summary judgment, motion in limine, and motion for summary judgment are affirmed.

MCFARLAND, C.J., and DAVIS, J., not participating.[1]

---

[1] Chief Justice Kay McFarland and Justice Robert E. Davis heard oral arguments in case No. 97,952 but did not participate in the final written decision before their respective retirements.